SM

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JD Merrick, | No. CV-22-00156-TUC-JGZ |
| Plaintiff, | |
| v. | **ORDER** |
| David Shinn, et al., | |
| Defendants. | |

Plaintiff JD Merrick, who is currently confined in the Arizona State Prison Complex (ASPC)-Tucson, Rincon Unit, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983.  (Doc. 94.)  Before the Court are Plaintiff's Motion for a Temporary Restraining Order and Temporary Injunction (Doc. 58), Motion for Reconsideration (Doc. 100), and Motion for Summary Judgment (Doc. 115), and Defendants' Motion for Summary Judgment.[1]  (Doc. 116.)

**I.      Background**

On screening Plaintiff's Fourth Amended Complaint (Doc. 94) under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a First Amendment retaliation claim against Defendants Shinn, Martinez, Savoie, and Rojas in their individual capacities in Count One; an Eighth Amendment medical care claim against Defendant Martinez in Count Two; and a Fourteenth Amendment due process claim in Count Three against

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Doc. 119.)

Defendant Thornell in his official capacity and Defendant McCoy in his individual capacity. (Doc. 93 at 9.) The Court ordered these Defendants to answer the respective claims against them and dismissed the remaining claims and Defendants. (*Id.*) The parties subsequently stipulated to dismiss Count Two (Doc. 102), and the Court granted the stipulation and dismissed that claim (Doc. 105).

Plaintiff moves for summary judgment on Count One. (Doc. 115.) Defendants Martinez, Rojas, Savoie, Shinn, and Thornell move for summary judgment on Plaintiff's remaining claims in Counts One and Three.[2] (Doc. 116.) Plaintiff also seeks reconsideration of the Court's July 26, 2023 Order denying his Motion for Sanctions/Motion to Compel. (Doc. 100.)

## II.   Motion for Reconsideration

"The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence." LRCiv 7.2(g)(1). No motion for reconsideration of an Order may repeat any oral or written argument made in support of or in opposition to the motion that resulted in the Order. *Id.* "Absent good cause shown," a motion for reconsideration must be filed "no later than fourteen (14) days after the date of the filing of the Order that is the subject of the motion." LRCiv 7.2(g)(2).

In its July 26, 2023 Screening Order, the Court denied Plaintiff's Motion for Sanctions/Motion to Compel (Doc. 78), noting that "Federal Rule of Civil Procedure 37(a)(3)(B)(iii) provides that a party may move to compel a discovery response when a party fails to answer an interrogatory. Upon reviewing Plaintiff's Motion, Plaintiff objects to the accuracy and/or credibility of some of Defendants' responses to his interrogatories. (*See id.*) This is not a valid basis for relief under Rule 37." (Doc. 93 at 7.) In his Motion for Reconsideration, dated August 15, 2023, Plaintiff moves the Court to reconsider its denial of his Motion for Sanctions/Motion to Compel. (Doc. 100.) Plaintiff argues that

---

[2] Defendant McCoy is not a participant in Defendants' Motion for Summary Judgment. McCoy was not served until November 9, 2023, (Doc. 121), and his deadline to file a dispositive motion does not expire until May 2, 2024. (*See* Doc. 135.)

his Motion was "not merely focused on the defendants' credibility" and that "Plaintiff simply pointed to the obvious inconsistency of the defendants' Answer to the Complaint and their answers to some of the discovery requests in driving home just how evasive they were." (*Id.* at 2.)

Plaintiff's Motion for Reconsideration is untimely because it was not filed within 14 days of the Court's Order denying the Motion for Sanctions/Motion to Compel.  LRCiv 7.2(g)(2).  Moreover, none of Plaintiff's arguments are based on new facts that arose or became known after the Court's July 26, 2023 Order.  Nor does Plaintiff identify a change in the law that occurred after the Court's decision or show that the Court failed to consider facts that were presented before the decision.  Rather, Plaintiff effectively asks the Court to rethink what it has already thought through, which is not a proper basis for reconsideration.  Contrary to Plaintiff's assertions, the Court did consider Plaintiff's challenges to Defendants' responses to the interrogatories and determined that sanctions were not warranted.  The Court has already addressed and rejected Plaintiff's arguments. As such, the Motion for Reconsideration is denied.

**III.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A movant is entitled to judgment as a matter of law against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  In

*Celotex*, the Supreme Court explained: "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322–23.

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## IV.   Count One – Retaliation

In Count One, Plaintiff alleges that Defendants Shinn, Martinez, Savoie, and Rojas interfered with his email and incoming and outgoing mail in retaliation for Plaintiff reporting alleged deliberate indifference to the Inmate Advocacy Group (IAG).

### A.   Legal Standard

A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against a prisoner (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the prisoner's exercise of his First Amendment rights (or that the prisoner suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005); *Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997). Plaintiff has the burden of proving his First Amendment retaliation claim at trial. *See generally Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) (discussing proof prisoner-plaintiff must present to defeat motion for summary judgment on retaliation claim); *see also Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (stating plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains).

1    **B.    Relevant Facts**[3]

2        Plaintiff is a prisoner in the custody of the Arizona Department of Corrections,

3    Rehabilitation and Reentry (ADCRR), and at all times material to this lawsuit, he was

4    assigned to the ASPC-Tucson, Rincon Unit.  (Doc. 117, DSOF ¶ 1; Doc. 122, PRSOF ¶ 1.)

5        According to Plaintiff, Plaintiff and his non-prisoner friends created the IAG to

6    "pressure . . . ADCRR to provide more medical staff and ensure med[ications] were given

7    as prescribed."  (Doc. 115-9, PSOF ¶ 14; Doc. 125, DRSOF ¶ 14.)  The concept of the IAG

8    was to pair an inmate with a volunteer outside of the prison who in turn would advocate

9    for their inmate. (Doc. 115-9, PSOF ¶ 14; Doc. 125, DRSOF ¶ 14.) The IAG volunteer

10   would send emails to prison officials and ask officials to investigate the inmate's allegation

11   and take corrective action.  (Doc. 115-9, PSOF ¶ 14; Doc. 125, DRSOF ¶ 14.)

12       In December 2021, an e-mail was sent to ADCRR leadership from a private Gmail

13   account; the e-mail was signed with Plaintiff's name and ADCRR prisoner number.  (Doc.

14   117, DSOF ¶ 4; Doc. 122, PRSOF  ¶¶ 4, 8.)  The parties dispute whether Plaintiff caused

15   the e-mail to be sent or whether it was sent by Plaintiff's friend, Kelly Meacham, a

16   volunteer with the IAG.  (Doc. 117, DSOF ¶ 4; Doc. 122, PRSOF ¶¶ 4–8; *see also* Doc.

17   117-1 at 3, Defs.' Ex. A.)  Plaintiff states, "Kelly Meacham sent an email via a Gmail

18   account to ADCRR Defendant Director David Shinn on the plaintiff's behalf . . . to ensure

19   Plaintiff receive[d] his med[ications] on time."  (Doc. 115-9, PSOF ¶ 15.)  Prison officials

20   suspected that the e-mail may have been sent directly from Plaintiff, in violation of

21   ADCRR policy.  (Doc. 117, DSOF ¶¶ 4–6.)

22       ADCRR prisoners are given tablets that allow them to send or receive e-mails 24

23   hours a day for a fee of $0.25 per e-mail.  (Doc. 115-9, PSOF ¶ 19; Doc. 125, DRSOF ¶

24

25       [3] The facts are taken from the Defendants' Statement of Facts in support of their
26   motion for summary judgment, cited as Doc. 117, DSOF; Plaintiff's responsive Statement
     of Facts, cited as Doc. 122, PRSOF; Plaintiff's Statement of Facts in support of his motion
     for summary judgment (which was filed as one of many attachments to his motion), cited
27   as PSOF, Doc. 115-9; and Defendant's responsive "Objection to Plaintiff's Statement of
     Facts," cited as Doc. 125, DRSOF. These facts are undisputed unless otherwise specified.
28   Where Defendants object to a relevant factual assertion by Plaintiff, the Court accepts the
     Plaintiff's allegation as true for purposes of resolving the pending motions.

19.)  ADCRR Department Order ("DO") 720 prohibits prisoners from having private e-mail accounts.  (Doc. 117, DSOF ¶ 5; Doc. 122, PRSOF ¶ 5.)  Additionally, DO 720 § 4.1 states: "All communications via the [prisoner] tablets are not confidential and are subject to monitoring and recording."  (Doc. 117, DSOF ¶ 25; Doc. 122, PRSOF ¶ 25.)  Section 5.2 of DO 720 provides that prisoners "are not permitted to message staff directly."  (Doc. 117, DSOF ¶ 25; Doc. 122, PRSOF ¶ 25.)   DO 720 further provides, "Email correspondence is unlimited and may be sent/received only through secure JPAY services . . . All email remains subject to review."  (Doc. 117, DSOF ¶ 26; Doc. 122, PRSOF ¶ 26.)

Physical mail to and from prisoners is governed by DO 914, which provides, in relevant part:

### 914 § 2.0 INCOMING MAIL

> 2.5 Designated staff at each unit/complex is authorized to open, inspect and read incoming mail to prevent criminal activity and prevent inmates from receiving contraband or any other material that may be detrimental to the safe and orderly operation of the institution.
>
> . . . .

### 914 § 6.0 OUTGOING MAIL

> 6.3 Staff shall read up to 10% of outgoing mail.
>
> . . . .
>
> 6.5 Outgoing inmate mail is subject to being opened and read by staff when there is a reasonable belief that the inmate is using the mail to further a crime or circumvent Department regulations or written instructions.

(Doc. 117, DSOF ¶ 30 (emphasis in original).)[4]

An investigation into the source of the e-mail and Plaintiff's ability to reach out to ADCRR senior leadership ensued, and it was determined that Plaintiff was "composing emails on his behalf, and they [were then] being sent out from another email from friends/family." (Doc. 117, DSOF ¶¶ 7–8; *see also* Doc. 117-1 at 3, Defs.' Ex. A.)  Plaintiff

---

[4] ADCRR Department Orders are publicly available at https://corrections.az.gov/department-orders-policy [permalink: https://perma.cc/P94T-2YB3].

admits that he helped to compose emails and that he "did assist Ms. Meacham in producing the Gmail by giving her the information she needed to advise the ADCRR director that [Plaintiff] wasn't getting his prescribed medications for his pain and serious heart condition." (Doc. 122, PRSOF ¶¶ 7–8.)  In fact, in a January 10, 2022 e-mail to Ms. Meacham, Plaintiff wrote:

> I was placed under investigation because some of the emails I was sending out on behalf of Inmate Advocacy Group [were] sent to the ADC Director using m[y] gmail account when those emails should've been sent via the Inmate Advocacy Group email accounts. . . . The SSU (investigators) were super cool about it and the[y] are trying to clear things up so I can go back to using my email app.

(Doc. 115-9, PSOF ¶ 37; *see also* Doc. 115-7 at 9, Pl.'s Attach. 13.)

On that same date, Plaintiff states he was called to see Defendants Savoie and Rojas to discuss his mail and the investigation, and Savoie and Rojas "acknowledged they were withholding the plaintiff's mail because . . . the Director's Office was angry with the plaintiff for having an email sent to [the Director] complaining [Plaintiff] was not getting his medications." (Doc. 115-9, PSOF ¶ 36.)  Plaintiff states that Defendant Savoie told him "he would try to let some of [Plaintiff's] mail through for the day and he [Savoie] and Rojas would talk to Defendant Deputy Warden Martinez and try to end their investigation into [Plaintiff's] mail because they . . . were wasting their time with [Plaintiff]." (*Id.*; Doc. 115-1, Pl. Decl. ¶ 36.)  Plaintiff's e-mail app continued to be disabled, and he still was not receiving his incoming postal mail. (Doc. 115-9, PSOF ¶ 37.)

As a result of the investigation into the e-mail, it was recommended that Plaintiff's e-mails be placed "on a 'watchlist' in which each of his notes require a review" in order to "help identify [Plaintiff's] ability to dictate emails to the outside on his behalf." (Doc. 117, DSOF, ¶¶ 10–14; Doc. 117-1 at 3, Defs.' Ex. A; Doc. 122, PRSOF ¶ 9–10, 12–13.)  The Rincon Unit Warden forwarded this recommendation to Defendant Deputy Warden Jorge Martinez, and the Warden asked Defendant Martinez to "get with JPay and put [Plaintiff] on the email watch list they speak about." (Doc. 117, DSOF ¶ 12; Doc. 122, PRSOF ¶ 12.)

Defendant Martinez forwarded the Warden's email to Erin Leon at JPay and asked if she could "place [Plaintiff] on the 'watch list.'"  (Doc. 117, DSOF ¶ 13; Doc. 122, PRSOF ¶ 13.)  That same day, Ms. Leon placed Plaintiff on the watch list and replied to Defendant Martinez as follows: "Also, please advise your SSU that they will be getting [Plaintiff's] emails for review. [Plaintiff] will start to complain that he is not receiving them. And he won't until SSU reviews and releases the email." (Doc. 117, DSOF ¶ 14; Doc. 122, PRSOF ¶ 14.)  Defendant Martinez forwarded Ms. Leon's email to Defendants Savoie and Rojas. (Doc. 117, DSOF ¶ 17; Doc. 122, PRSOF ¶ 17.)  Plaintiff asserts that, thereafter, he only received "about 60% of his incoming mail."  (Doc. 122, PRSOF ¶ 14.)[5]

Plaintiff alleges that on or about February 5, 2022, he was called to meet with Defendants Savoie and Rojas, and, during the meeting, he complained that he was not receiving his incoming mail and that his outgoing mail was "disappearing."  (Doc. 115-9, PSOF ¶ 46.)  Defendants Savoie and Rojas told Plaintiff, "there was nothing they could do because they [were] under orders from 'on top.'  They said they would talk to [Defendant] Martinez . . . but that was all they can do."  (Id.)

In a February 17, 2022 letter to his attorney, Plaintiff stated that he was receiving "SOME mail, but most doesn't get to [him]" and that his e-mails took between "2–7 days" to reach him because "SSU pushes them through once every few days if they have time."  (Id. ¶ 47 (emphasis in original).)

In a February 23, 2022 letter to Plaintiff's lawyer, ASPC-Tucson Warden Josefowicz relayed that the Grievance Coordinator had met with Plaintiff and explained that, per DO 720, incoming and outgoing email that has been held for security reasons must be reviewed within three days by mailroom staff prior to releasing the mail to an inmate. (Doc. 115-9, PSOF ¶ 48; Doc. 125, DRSOF ¶ 48.) Further, the letter advised that policy permits review of all incoming and outgoing mail for security reasons, which sometimes causes a delay, and that ADCRR does not prevent or prohibit inmates from communicating

---

[5] Plaintiff asserts that Defendants Martinez, Rojas, and Savoie were responsible for his missing mail, but he does not provide any evidence to support this statement.

1  via electronic message or postal service.  (Doc. 115-9, PSOF ¶ 48; Doc. 125, DRSOF ¶

2  48.)

3          According to ADCRR records, monitoring of Plaintiff's e-mail correspondence

4  stopped by May 2022.  (Doc. 117, DSOF ¶ 21; Doc. 122, PRSOF ¶ 21; Doc. 115-9, PSOF

5  ¶ 56; Doc. 125, DRSOF ¶ 56.)  However, Plaintiff denies that the monitoring of his postal

6  mail ended on this date, and asserts that he was still not receiving all of his incoming mail,

7  recipients were not receiving his outgoing mail, and that this continued through late-August

8  2022.  (Doc. 122, PCSOF ¶ 21; Doc. 115-9, PSOF ¶¶ 57, 75.)  He also asserts that staff

9  was reviewing 100 percent of his outbound mail.  (Doc. 115-9, PSOF ¶ 75.) Plaintiff

10 pursued multiple administrative grievances regarding this issue between April 2022 and

11 July 2022.  (*Id.* ¶¶ 60–73.)

12         Plaintiff filed this lawsuit in April of 2022.  (Doc. 1.)

13   **C.    Plaintiff's Evidence is Insufficient to establish essential elements of his
14           First Amendment Retaliation Claim Against the Defendants.**

15         **1.    Adverse Action**

16         The record does not support a finding that Defendant Shinn took adverse action

17 against Plaintiff.  Plaintiff asserts that Defendant Shinn ordered the investigation into the

18 December 2021 e-mail, but he has not presented any evidence to support this statement or

19 to show that Defendant Shinn ordered the monitoring and restrictions that were eventually

20 placed on Plaintiff's correspondence. *See Hines*, 108 F.3d at 267 (retaliation claims require

21 a plaintiff to show that the prison official acted in retaliation for the exercise of a

22 constitutionally protected right).   Defendant Shinn was not a recipient or sender in any of

23 the e-mails surrounding the investigation, Plaintiff's placement on the watchlist, or the

24 monitoring and restriction of Plaintiff's communications.  Also, Defendant Shinn did not

25 personally respond to any of Plaintiff's grievances regarding this issue.  Absent a showing

26 that Defendant Shinn personally participated in taking adverse action against Plaintiff,

27 Defendant Shinn is entitled to summary judgment.

28 //

### 2.      Retaliatory Motive

As for the remaining Defendants in Count One, even if there is a triable issue as to whether Defendants Martinez, Savoie, and Rojas took adverse action against Plaintiff by placing him on the watchlist and restricting Plaintiff's correspondence, the record does not show that they did so because of Plaintiff's purported protected conduct. In order to prevail on a retaliation claim, "a plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." *Brodheim*, 584 F.3d at  1271 (9th Cir. 2009) (citation and internal quotation omitted).  To raise a triable issue as to motive, Plaintiff must offer "either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence [of that motive]."  *Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002).  Such circumstantial evidence includes (1) proximity in time between protected speech and alleged retaliation; (2) the defendant's expression of opposition to the speech; and (3) other evidence that the reasons proffered by defendant for the adverse action were false and pretextual.  *See McCollum v. Cal. Dep't of Corr. and Rehabilitation*, 647 F.3d 870, 882 (9th Cir. 2011).

Here, there is evidence of proximity in time between the December 2021 e-mail being sent to prison officials and Plaintiff's placement on the watch list and the restrictions on his communications starting in early January 2022.  But suspect timing, without more, is not enough to show retaliatory intent.  *See Pratt*, 65 F.3d at 808 (9th Cir. 1995) (finding that timing alone is insufficient to establish retaliatory motive).

Plaintiff does not provide any evidence that any of the Defendants expressed opposition to the contents of the e-mail.  Rather, all of the evidence shows that Defendants' concerns were with the fact that Plaintiff might have the ability to send emails to senior prison officials, which was prohibited.  There is no evidence that any Defendant focused on or had concerns about the content of the communication.

Moreover, there is no evidence that the reasons for investigating and monitoring Plaintiff's communications were false or pretextual.  It is undisputed that an e-mail with Plaintiff's name and inmate number was sent from a private e-mail account to a senior

prison official.  It is a violation of prison policy for a prisoner to maintain a private e-mail account.  Plaintiff has admitted that he contacted Ms. Meacham for the purpose of writing the suspect e-mail.  Thus, officials had a reasonable belief that Plaintiff was violating prison policy or may have been attempting to circumvent ADCRR regulations when they placed him on the watch list and restricted his communications.

Here, nothing except suspect timing supports an inference of retaliatory intent.  In light of the remaining undisputed evidence, Plaintiff fails to support his claim that the investigation, monitoring, and restriction of his communications occurred "because of" his exercise of his First Amendment rights. *See Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (finding that the plaintiff has the burden of demonstrating that his exercise of his First Amendment rights was a substantial or motivating factor behind the defendants' conduct) (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  For this reason, Defendants are entitled to summary judgment on Count One.

### 3.      Legitimate Penological Interest

A plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt*, 65 F.3d at 806.  The Court evaluates a retaliation claim in light of the deference accorded prison officials. *Id.* at 807.  It is well-settled that "the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence." *Procunier v. Martinez*, 416 U.S. 396, 412–13 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989); *see O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9th Cir. 1996) (deterring criminal activity and maintaining prisoner security are legitimate penological interests that justify regulations on prisoner mail).  In this instance, the investigation, monitoring, and restriction of Plaintiff's correspondence were undertaken to further ADCRR's legitimate security interest in monitoring prisoners' communications with the outside world by making sure prisoners do not circumvent the prohibition on private e-mail accounts.  Plaintiff's failure to prove the

absence of a legitimate correctional goal—a necessary element of his claim, provides an additional basis for granting summary judgment to Defendants.[6] *See Hines*, 108 F.3d at 267 (plaintiff bringing a retaliation claim must prove that the alleged adverse action "advanced no legitimate penological interest").

## V.    Count Three – Due Process

In Count Three, Plaintiff asserts an official capacity claim against Defendant Thornell.  Plaintiff claims that his due process rights were violated when he was reassigned to probationary trainee status at his prison job, his wages were reduced, and his second stimulus check was returned to the IRS as a result of Defendant Thornell's policies that prohibited Plaintiff from accessing the Internal Revenue Service (IRS) website and calling the IRS office in order to correct a discrepancy between Plaintiff's former and current legal names.[7]

### A.    Relevant Facts

Plaintiff's legal name was Jeffrey Merrick Logan until November 1, 1999, when he changed his name to JD Merrick.  (Doc. 117, DSOF ¶¶ 2, 3; Doc. 94 ¶ 53.[8])  For 22 or 23 years, Plaintiff has worked at various prison jobs and received wages under the name JD Merrick. (Doc. 94 ¶ 56.)  Plaintiff's social security number returns to the name Jeffrey Merrick Logan.  (*Id.* ¶¶ 54–55.)

In June 2021, Plaintiff received a stimulus check under the American Rescue Plan, and it was deposited into his inmate trust account. (*Id.* ¶ 60.) When Plaintiff attempted to apply for his second stimulus check, he received a letter from the IRS stating that his second stimulus check was being withheld because his legal name—JD Merrick—did not match

---

[6] In light of the Court's conclusion that Plaintiffs has failed to produce evidence sufficient to support his First Amendment Claim, the Court will not address Defendants' qualified immunity argument.

[7] The Court will limit its discussion of Count Three to Plaintiff's claim against Defendant Shinn because Defendant McCoy has not moved for summary judgment at this time.

[8] Because Plaintiff is a pro se litigant, the Court will consider as evidence in opposition to summary judgment all of Plaintiff's contentions set forth in the verified Fourth Amended Complaint (Doc. 94). *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

his social security number, which was still associated with the name Jeffrey Merrick Logan. (*Id.* ¶¶ 61–62.) The IRS informed Plaintiff that he could call their Integrity Verification Operations office or visit their website to verify his identity, or he could submit a W9 Tax Form to verify his identity. (*Id.* ¶ 63.)

Plaintiff was informed by "prison administration" that he was not allowed to call the IRS or visit their website.  (*Id.* ¶ 64.)[9]  According to Plaintiff, he submitted several W-9 forms to the IRS, but the IRS disregarded them.  (*Id.* ¶ 65.)

On October 5, 2022, the IRS mailed Plaintiff's second stimulus check to Plaintiff at the prison, but the check was returned because it was made payable to Jeffrey Merrick Logan and not to JD Merrick.  (*Id.* ¶ 76.)

Federal law requires an employer to issue information returns, such as W-2 forms and 1099 forms.  *See* 26 U.S.C. § 6051(a); 26 C.F.R. § 31.6051-1.  The failure to provide such forms creates liability to the United States on the part of an employer. *See* 26 U.S.C. §§ 6051, 6722.  According to the IRS website:

> Every employer engaged in a trade or business who pays remuneration, including noncash payments of $600 or more for the year (all amounts if any income, social security, or Medicare tax was withheld) for services performed by an employee must file a Form W-2 for each employee (even if the employee is related to the employer) from whom:
>
> Income, Social Security, or Medicare tax was withheld.
>
> Income tax would have been withheld if the employee had claimed no more than one withholding allowance or had not claimed exemption from withholding on Form W-4, Employee's Withholding Allowance Certificate.[10]

---

[9] DO 915 is the ADCRR policy governing the use of phones by prisoners.  (*Id.* ¶ 33.)  Under DO 915, prisoners are prohibited from dialing 1-800 or 1-900 numbers.  (*Id.*; s*ee* DO 915 §§ 1.4.3, 1.4.3.6 ("The following types of phone calls are prohibited . . . Calls to 800 and 900 phone numbers.").)ADCRR Department Order 915, https://corrections.az.gov/sites/default/files/documents/policies/900/DO%20915.pdf [permalink: https://perma.cc/F4LR-AKWF].

[10] *See* About Form W-2, Wage and Tax Statement, https://www.irs.gov/forms-pubs/about-form-w-2 [permalink: https://perma.cc/4B8L-BJJZ].

The ADCRR Director has set forth applicable pay rates for prisoner workers in DO 903.  (Doc. 117, DSOF ¶ 36; Doc. 122, PRSOF ¶ 36.)  DO 903 provides, in relevant part:

### 3.0 WORK PROGRAM ASSIGNMENT PROCESS

> 3.1.1.5 Verify the inmate's employment eligibility to earn above the $599 annual income threshold based on the Internal Revenue Service (IRS) guidelines.

> 3.1.1.5.1 The CO III / CO IV shall screen all inmates for employment eligibility. The screening shall include the presence of valid SSN or TIN [tax identification number].

> 3.1.1.5.2 Inmates that do not have a valid SSN or TIN may be assigned to a job but will not be compensated more than .20 cents per hour.

> 3.1.1.5.3 An inmate shall be assigned into a Probationary Trainee position and shall remain in this job classification unless they are able to furnish the required IRS credentials. It is the responsibility of the inmate to take the necessary steps to obtain and furnish the required IRS credentials to the WIPP CO III.

> 3.1.1.5.3.1 Removal from the probationary trainee status shall only occur when the required credentials are provided to the CO III by the inmate and are validated by the ADCRR TIN Administrator.

(Doc. 117, DSOF ¶ 37; Doc. 122, PRSOF ¶ 37.)

Rudy Arevalo is employed as the Business Administrator with the ADCRR at the Arizona Prison Complex, Tucson. (Doc. 117-1 at 27, Defs.' Ex. H ¶ 2.) According to Mr. Arevalo, under federal law, inmates whose anticipated pay will be greater than $599 in annual wages must have a name and social security number that match to each other as determined by federal databases. (Doc. 117, DSOF ¶ 38.)[11]  An inmate's eligibility to earn

---

[11] Plaintiff objects to the Paragraphs 39–43 of the DSOF, asserting Mr. Arevalo is not qualified to testify on behalf of the IRS and federal government.  (Doc. 122, PRSOF ¶ 38.)  In his declaration, Mr. Arevalo describes ADCRR's policies and procedures for payment of inmate wages and he explains how the policy and procedures are based on ADCRR's understanding of federal law.  Mr. Arevalo's declaration establishes he is qualified to testify as to ADCRR's procedures and policies. The declaration is signed, made under penalty of perjury, and shows that Mr. Arevalo's testimony is based on his personal knowledge, experience, and his review of relevant ADCRR documents maintained in the

more than the $599-per-year federal guideline amount is determined by the TIN Administrator running the prisoner's name against his social security number in federal databases. (*Id.* ¶ 39.)   ADCRR interprets DO 903 and federal law to mean that ADCRR cannot employ prisoners like Plaintiff—whose social security card and W-2 do not match—at a wage that exceeds the $599 threshold.  (*Id.* ¶ 40.) Mr. Arevalo relates that in 2019 and 2022, the IRS audited ADCRR and cracked down on prisoners making more than $599 where the prisoner's name did not match their social security number.  (*Id.* ¶ 41.)

On or about March 26, 2022, Plaintiff was reassigned to a probationary trainee position, and his rate of pay was reduced from thirty-five cents per hour to twenty cents per hour to comply with federal guidelines and DO 903 because his legal name did not the match the name on his social security card in federal databases.  (*Id.* ¶¶ 42, 43; *see* Doc. 94 ¶¶ 67–68.)  Mr. Arevalo states that ADCRR cannot pay Plaintiff a higher rate of pay until the federal government confirms that his social security number and current legal name match.  (Doc. 117, DSOF ¶ 44.)

In response to Plaintiff's interrogatories, former TIN Administrator Jennifer Villa stated that she "processed one W9 for [Plaintiff]" and that it "had both [of Plaintiff's] last names on it." (Doc. 122-1 at 3.)  While processing Plaintiff's W-9 form, Ms. Villa entered combinations of Plaintiff's social security number with his former last name (Logan) and his current legal last name (Merrick), and the search "came back with an IRS database match" between Plaintiff's social security and his previous last name (Logan).  (*Id.*)  After processing Plaintiff's W-9, Ms. Villa sent an e-mail to CO III Deliana Noel on April 25, 2022 informing her that "[Plaintiff] cleared as Logan and there was no need to keep him probationary."  (*Id.*)   Ms. Villa's "understanding was [that] if the social security number/name combination matched the inmate was not to be [on] probationary work status. The W9 [Plaintiff] provided ha[d] both names on it and both were his, and he cleared." (*Id.*)  Ms. Villa stated that she has "nothing to do with [enforcing] DO 903."  (*Id.*)

---

ordinary course of business.  (Doc. 117-1 at 27, Defs.' Ex. H  ¶¶ 1, 2.) Thus, the Court overrules Plaintiff's objections.

In a letter dated July 26, 2023, Assistant Attorney General Nancy Davis informed Plaintiff that:

> Your pay was reduced in accordance with DO 903 because your SSN does not match your given name.  What steps have you taken to contact the Social Security Administration to have your SSN card updated so that your name change matches your SSN?  The documents you have provided in grievances reflect your efforts to contact the IRS, but I do not see any evidence that you have actually reached out to the SSA about this issue.  For your convenience, I have enclosed publically [sic] available information regarding the SSA and their instructions on how to have such information updated.
>
> Until the SSA acknowledges this change and updates its records, you are not eligible to work at the higher rate of pay because your name and SSN do not match on federal reporting databases.  There is nothing ADCRR can do to change this as this is a federal agency issue, not an ADCRR issue, and it impacts tax reporting requirements.  Without a valid match between your SSN and name, ADCRR cannot issue you a 1099 and 1099s must be issued for all compensation paid in excess of $600 per year.

(Doc. 117-1 at 63, Defs.' Ex. L.)

**B.     Claim for Damages**

Plaintiff cannot maintain a claim for damages against Defendant Shinn in his official capacity under § 1983 because "a suit against a state official in his or her official capacity is not a suit against the official but . . . against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted) (holding that the Eleventh Amendment protects states from being sued for damages in federal court).  By its express terms, § 1983 applies to "person[s]" acting under color of state law, which does not include states.  *Hafer v. Melo*, 502 U.S. 21, 26 (1991); *see also Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1327 (9th Cir. 1991) ("[A] state is not a 'person' for purposes of section 1983.  Likewise[,] 'arms of the State' such as the Arizona Department of Corrections are

not 'persons' under section 1983.") (citation omitted). Therefore, Plaintiff's official capacity claim is limited to prospective relief only.

### C.    Official Capacity Claim

To prevail on a claim against Defendant Thornell in his official capacity, Plaintiff must show that an official policy or custom caused the constitutional violation. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978). To make this showing, Plaintiff must demonstrate that (1) he was deprived of a constitutional right; (2) Defendant Thornell had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001). Further, if the policy or custom in question is an unwritten one, Plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).

### 1.    Constitutional Violation

"The threshold question in due process analysis is whether a constitutionally protected interest is implicated." *Baumann v. Arizona Dep't of Corr.*, 754 F.2d 841, 843 (9th Cir. 1985). Here Plaintiff fails to demonstrate a constitutionally protected interest in his wages or in the stimulus check.

### a.    Probationary Status/Reduced Wages

"[T]he Due Process Clause of the Fourteenth Amendment 'does not create a property or liberty interest in prison employment[.]'" *Walker v. Gomez*, 370 F.3d 969, 973 (9th Cir. 2004) (quoting *Ingram v. Papalia*, 804 F.2d 595, 596 (10th Cir. 1986) (per curiam), and citing *Baumann*, 754 F.2d at 846); *Vignolo v. Miller*, 120 F.3d 1075, 1077 (9th Cir. 1997). A prisoner has no constitutional right to a particular job assignment. *See West v. Beauclair*, 338 F. App'x 716, 717 (9th Cir. 2009) ("[prisoner] did not have a liberty or property interest in the prison job that he lost, or prison jobs that he was precluded from obtaining, as a result of his [disciplinary] conviction"); *Cunningham v. Bird*, No. 1:22-cv-

00306-JLT-SAB (PC), 2022 WL 1308261, at *1 (E.D. Cal. May 2, 2022), *report and recommendation adopted*, 2022 WL 2119045 (E.D. Cal. June 13, 2022); *see also Cornellier v. Walker*, No. CV-04-0724-PHX-PGR (JJM), 2004 WL 7334915, at *3 (D. Ariz. Aug. 11, 2004) ("[T]he loss of a prison job does not raise a constitutional claim"). Further, under Arizona law, prisoner wage amounts are set by the ADC Director:

> Each prisoner who is engaged in productive work in any state prison or institution under the jurisdiction of the department or a private prison under contract with the department as a part of the prison industries program shall receive for the prisoner's work **the compensation that the director determines**.

Ariz. Rev. Stat. § 31-254(A) (emphasis added).  Therefore, Plaintiff's reassignment to probationary trainee, and his resulting reduction in wages, did not trigger due process protection.  As stated, ADCRR prisoner wages are determined by the Director, and the Director has determined—as set forth in DO 903—that prisoner wages must comply with IRS regulations, and those that do not comply must be brought into compliance by designating the prisoner as a probationary trainee until the prisoner has provided proper credentials.  On these facts, Plaintiff did not suffer a due process violation by having his job assignment and wages adjusted.  *See Rainer v. Chapman*, 513 F. App'x 674, 675 (9th Cir. 2013) (holding that the district court properly dismissed the prisoner-plaintiff's "due process claims based on his removal from his work assignment because these allegations did not give rise to a constitutionally protected liberty or property interest); *Hunter v. Heath*, 95 F. Supp. 2d 1140, 1147 (D. Or. 2000) ("It is uniformly well established throughout the federal circuit courts that a prisoner's expectation of keeping a specific prison job, or any job, does not implicate a property or liberty interest under the Fourteenth Amendment."), *rev'd on other grounds*, 26 F. App'x 754, 755 (9th Cir. 2002).

### b.     Returned Stimulus Check

Plaintiff fails to establish that the return of the second stimulus check to the IRS triggered due process protections.  In a similar case, a court found that a prisoner failed to show a protected property interest in a tax refund that was erroneously deposited in his

inmate trust account.  *See Brazier v. CDCR*, No. 2:12–cv–0883 CKD P., 2014 WL 4187361, at *3 (E.D. Cal. Aug. 21, 2014).  In *Brazier*, the prisoner-plaintiff received two tax refund checks from the IRS totaling $1,267.00, and the IRS subsequently informed the prison that the checks had been issued in error.  *Id.* at *1.  The funds were thereafter withdrawn from the plaintiff's trust account and returned to the IRS without the plaintiff's consent or a hearing.  *Id.*  In finding that the record did not establish a due process violation, the court noted that the plaintiff did "not produce[] any evidence that the refunds were anything but administrative mistakes, soon corrected."  *Id.* at *3.

Similarly, in the instant case, the IRS had previously informed Plaintiff that he would not receive his second stimulus check because his legal name did not match his social security number.  (Doc. 94 at 25.)  Although the check was subsequently sent to Plaintiff despite his names still not matching, there is no evidence in the record that this was anything more than a clerical error.  *See Brazier*, 2014 WL 4187361, at *3 ("While the funds were issued by the government and briefly credited to plaintiff's trust account, this alone does not suffice to show a protected property interest.").  "The 'mere fact a person has received a government benefit in the past, even for a considerable length of time, does not, without more, rise to the level of a legitimate claim of entitlement.'"  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) (quoting *Doran v. Houle*, 721 F.2d 1182, 1186 (9th Cir. 1983)) (cleaned up).[12]  Accordingly, Plaintiff fails to present evidence sufficient to show a due process violation with respect to the returned stimulus check.

//

//

---

[12] Notably, it is not clear that a private cause of action exists for non-receipt of stimulus funds. *See Edmisten v. Internal Revenue Serv.*, No.: 3:21-cv-00232-MMD-WGC, 2021 WL 5177460, at *5 (D. Nev. Aug. 19, 2021) ("It does not appear that a private cause of action can be maintained under the legislation authorizing the disbursement of [stimulus checks].  The laws do not indicate that there is a private cause of action for non-receipt of funds.")

**2.      Existence of Policy Amounting to Deliberate Indifference**

Even if Plaintiff suffered a constitutional violation, the facts do not support a finding that Defendant Thornell's policy of not allowing prisoners to call 1-800 numbers or to access the IRS website amounted to deliberate indifference.  A policy or custom is deliberately indifferent when its inadequacy is obvious and likely to result in the violation of a constitutional right.  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  But even "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).  Defendants argue that ADCRR has a legitimate security interest in monitoring and limiting prisoners' telephonic and online communications with the outside world and that allowing prisoners to call 1-800 numbers and access certain public websites places the public at risk of fraudulent behavior.  (Doc. 116 at 11, 13–14.)

Prisoners have a right to telephone access, but "this right is subject to reasonable limitations arising from the legitimate penological and administrative interests of the prison system." *Johnson v. California*, 207 F.3d 650, 656 (9th Cir. 2000) (citing *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)); *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996).  Such reasonable limitations include prohibitions on calling 1-800 numbers.  *See Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992) (upholding a state penitentiary's policy of prohibiting prisoners from making 1-800 telephone calls); *Thomas v. SCI-Graterford*, No. CIV.A. 11-6799, 2014 WL 550555, at *6 (E.D. Pa. Feb. 12, 2014) (finding that the prison's refusal to permit prisoner to call his attorney on a 1–800 phone number did not give rise to a constitutional violation).

Moreover, prisoners do not enjoy unfettered access to the internet.  *Nickerson v. Gootkin*, No. CV 22-95-H-BMM-KLD, 2023 WL 7053494, at *1 (D. Mont. Oct. 26, 2023) (noting that prisoner "d[id] not possess a constitutional right to the internet"); *Mitchell v. Dragoo*, No. 10-5436RBL, 2011 WL 3739054, at *5 (W.D. Wash. July 21, 2011), *report and recommendation adopted*, No. 3:10-CV-05436-RBL, 2011 WL 3739046 (W.D. Wash. Aug. 24, 2011) ("There is no constitutional right to internet access [for inmates].");

*Evenstad v. Schnell*, No. 20-CV-1464 (WMW/DTS), 2022 WL 617598, at *13–14 (D. Minn. Jan. 13, 2022), *report and recommendation adopted*, No. 20-CV-1464 (WMW/DTS), 2022 WL 616962 (D. Minn. Mar. 2, 2022) (prisoner who challenged policy that restricted his internet access to "work, educational, and vocational purposes" did not state a constitutional claim); *Alverson v. Munchin*, No. 2:21-CV-16-ECM-KFP, 2021 WL 11421353, at *5 (M.D. Ala. Aug. 25, 2021), *report and recommendation adopted*, No. 2:21-CV-16-ECM, 2021 WL 4188396 (M.D. Ala. Sept. 14, 2021) ("[T]he Court can find no support for the contention that a lack of internet access to file a tax refund in prison constitutes a denial of Plaintiff's constitutional right to equal protection."); *Edwards v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:19-CV-0254 (MAD/ATB), 2019 WL 1978803, at *5 (N.D.N.Y. May 3, 2019) ("Although prison inmates retain a right under the First Amendment to send and receive information while incarcerated, . . . they do not have a constitutional right to a particular form of communication, including access to the internet or email.") (citations omitted); *Duenes v. Wainwright*, No. A-17-CV-0726-LY, 2017 WL 6210904, at *3 (W.D. Tex. Dec. 7, 2017) ("State inmates do not have a federal constitutional right to possess computers or to access the Internet."); *Johnston v. Dooley*, No. 4:15-CV-04125-LLP, 2015 WL 7734284, at *6 (D.S.D. Nov. 10, 2015), *report and recommendation adopted*, No. CIV 15-4125, 2015 WL 7734015 (D.S.D. Nov. 30, 2015) ("To suggest that denying inmates access to the Internet is cruel and unusual punishment is simply frivolous."); *Darby v. Schmalenberger*, No. 1:12-CV-033, 2012 WL 5471881, at *6 (D.N.D. May 7, 2012), *report and recommendation adopted in part*, No. 1:12-CV-033, 2012 WL 5471876 (D.N.D. Nov. 9, 2012) (finding that prisoner "has neither a right to internet access nor a right to file electronically" and that prison "has a legitimate penological interest in restricting inmates' internet access").

On this record, the evidence does not show that ADCRR's policy regarding 1-800 numbers and accessing the IRS website are obviously inadequate or likely to result in the violation of a constitutional right. Moreover, ADCRR has a legitimate interest in prohibiting certain prisoner communications that place the public at heightened risk of

being subjected to fraudulent or abusive behavior, particularly where Plaintiff has alternative means of engaging in those communications, such as through written correspondence. *See Turner*, 482 U.S. at 90 ("Where 'other avenues' remain available for the exercise of the asserted right . . . courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'") (citations omitted). Accordingly, Plaintiff has not identified a genuine issue of material fact as to this element of the *Monell* analysis.

Because the evidence does not support a constitutional violation or the existence of a policy or custom amounting to deliberate indifference, Plaintiff's official capacity claim fails, and summary judgment will be granted to Defendant Thornell.

## VI.   Motion for Injunctive Relief

A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

In his Motion for a Temporary Restraining Order and Temporary Injunction, Plaintiff seeks the following relief:

> 1. Remove [Plaintiff] from the Probationary Training position and restore his regular pay[;] 2. Compensate [Plaintiff] for any and all lost wages he would have received if he had not been placed in a Probationary Training Position[;] and 3. Pay [Plaintiff] $1,417.91, the amount of the IRS check that the ADCRR returned to the IRS.

(Doc. 58 at 22.)

As discussed above, Plaintiff fails to provide evidence sufficient to support a finding that Plaintiff's placement on probationary training status, the resulting reduction of his wages, or the return of the second stimulus check amounted to constitutional violations. Because the record does not show a likelihood of success as to Plaintiff's due process claim in Count Three, and the facts do not establish a serious question going to the merits of that claim, the Motion will be denied.

**IT IS ORDERED:**

(1)    Plaintiff's Motion for Temporary Restraining Order and Temporary Injunction (Doc. 58) is **denied**.

(2)    Plaintiff's Motion for Reconsideration (Doc. 100) is **denied**.

(3)    Plaintiff's Motion for Summary Judgment (Doc. 115) is **denied**.

(4)    Defendants' Motion for Summary Judgment (Doc. 116) is **granted**.

(5)    Plaintiff's Count One retaliation claim, Count Two official capacity claim, and Defendants Martinez, Rojas, Savoie, Shinn, and Thornell are **dismissed with prejudice**.

(6)    The only claim remaining in this action is Plaintiff's Count Three due process claim against Defendant McCoy.

Dated this 20th day of March, 2024.

Jennifer G. Zipps
United States District Judge

- 23 -